UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAUROSOL FELIX; DANILO MELENDEZ;
ABRAHAM COLLINS; FRANCISCO ZAPATA;
ANGEL SANCHEZ; and ANTHONY FEARON,

                    Plaintiffs,

– against –

CITY OF NEW YORK; RAYMOND W. KELLY,
Commissioner of the New York City Police
Department ("NYPD"); NYPD Deputy Inspector
RUSSELL J. GREEN; NYPD Deputy Inspector JOHN
HART; NYPD Captain MARC BUSELL; NYPD
Officer CINTRON, Shield # 17999; NYPD Officer
EDWIN JEREZ, Shield # 9352; NYPD Officer
GUAGLIARDI; NYPD Officer MALVI MONCION,
Shield # 12778; NYPD Sergeant DANIA CASTRO;
NYPD Officer KEVIN M. MARTIN, Shield # 24921;
NYPD Officer PRIMITIVO MONTANEZ, Tax #
939058; NYPD Officer ANDRY DUARTE, Shield #
7302; NYPD Officer BRIAN J. FLYNN, Shield #
2084; NYPD Officer STEVEN LANCIA, Shield #
8781; RICHARD ROES # 1-10; and JOHN/JANE
DOES # 1-5,

                    Defendants.

13 Civ. 2941 (JMF)

**SECOND AMENDED
COMPLAINT AND
JURY DEMAND**

**ECF CASE**



Plaintiffs Maurosol Felix, Danilo Melendez, Abraham Collins, Francisco Zapata,

Angel Sanchez, and Anthony Fearon (collectively, "Plaintiffs"), by their attorneys Emery Celli

Brinckerhoff & Abady LLP and The Bronx Defenders, for their Second Amended Complaint

allege as follows:

## PRELIMINARY STATEMENT

      1.     This is a civil rights action against the City of New York and New York

City Police Department ("NYPD") officers for deliberately targeting Plaintiffs—six Black and

Latino men—stopping and searching them without cause, lying about their conduct, and falsely charging them with a crime they did not commit, namely, possessing marijuana in a manner that is "open to public view."  As a result of Defendants' unlawful actions, Plaintiffs, and indeed thousands of individuals in New York City, and the Bronx in particular, have been unnecessarily forced to endure the humiliation, burden, damage and negative collateral consequences of being falsely charged with a misdemeanor crime, put through the criminal justice system, and compelled to return to court multiple times—all for a crime these men did not commit and which, shockingly, the charging police officers *knew* they did not commit.  Plaintiffs seek to recover damages for Defendants' improper stops, illegal searches, false arrests, malicious prosecutions and abuses of process in violation of the Fourth and Fourteenth Amendments to the United States Constitution and state common law.

2.      Plaintiffs are all residents of the Bronx, where they work in various fields such as human services, journalism and food services, and where they raise or live nearby their families.  Plaintiffs were all arrested and charged with violating N.Y. Penal Law § 221.10 (hereinafter, "§ 221.10"), a class B misdemeanor, which prohibits possessing a small quantity of marijuana (less than twenty-five grams) that is either "burning or open to public view."  At the time they were arrested, none of the Plaintiffs possessed marijuana that was burning or open to public view.  Instead, each Plaintiff, as a result of an unjustified stop and illegal search, was found to have a small quantity of marijuana concealed on his person.  New York's Penal Law mandates that persons found in possession of a small quantity of concealed marijuana be charged under N.Y. Penal Law § 221.05 (hereinafter, "§ 221.05"), a violation as opposed to a misdemeanor.  In each Plaintiff's case, the charging police officer lied about the Plaintiff's

conduct by asserting he had possessed marijuana in "public view," and charged the Plaintiff with a misdemeanor crime rather than a violation (hereinafter the "Manufactured Misdemeanor").

3.     For each Plaintiff, the practical consequences of the Manufactured Misdemeanor are enormous—the misdemeanor charge is entered into the New York State Division of Criminal Justice Services ("DCJS") database, which may follow a person for life; a person may be deprived of his statutory entitlement to the issuance of a Desk Appearance Ticket ("DAT"), *see* N.Y. Crim. Proc. Law § 150.75, unnecessarily subjecting him to full arrest process and hours—sometimes days—of pre-arraignment incarceration; and the speedy trial time allotted to the prosecution is extended, increasing the number of court dates and missed days of work a person must endure in order to exercise his right to challenge the evidence against him. *Compare* N.Y. Crim. Proc. Law § 30.30(c) (sixty days where defendant is charged with a misdemeanor) *with* N.Y. Crim. Proc. Law § 30.30(d) (thirty days where defendant is charged with a violation). And, unlike a violation, a person convicted of a class B misdemeanor may be sentenced to up to three months in jail.

4.     Plaintiffs are not the only Black and Latino New Yorkers who have been subject to Manufactured Misdemeanors by the NYPD for possessing small quantities of marijuana concealed on their person. Studies consistently show that Black and Latino New York City residents, such as Plaintiffs, overwhelmingly and disproportionately bear the brunt of the NYPD's marijuana arrest practices. From 2003 through 2011, 87.0% of people arrested and charged under § 221.10 for possessing marijuana "burning or open to public view" in New York City were either Black or Latino. Conversely, only 10.2% were White. The disparity is even more acute in the Bronx, where DCJS records show that 95.4% of all persons arrested and charged under § 221.10 were either Black or Latino. Meanwhile, studies show that between

2002 and 2009, among persons between the ages of 18 and 25, a greater percentage of Whites used marijuana than either Blacks or Latinos.

5.      Defendants' misconduct is part of a pervasive and entrenched pattern of misconduct by the NYPD relating to the enforcement of marijuana laws.  Through drug reform lobbying efforts in Albany, reports by civil rights organizations, countless news articles, and other means, the NYPD has long been aware that its officers regularly Manufacture Misdemeanors against Blacks and Latinos.  Indeed, in an Operations Order dated September 19, 2011, the NYPD all but acknowledged how systemic the practice of Manufacturing Misdemeanors is on the force.  *See* NYPD Operation Order # 49, September 19, 2011.  Nonetheless, the NYPD has deliberately chosen to ignore the known misconduct of its officers and failed to provide adequate training or supervision to halt the constitutional violations that Manufactured Misdemeanors so obviously cause to Black and Latino New Yorkers.  In fact, the NYPD has encouraged Manufactured Misdemeanors by promoting a policy and practice of targeting communities of color for heightened enforcement of the marijuana laws, subjecting Blacks and Latinos to the harsher consequences of a misdemeanor prosecution and sentence at a significantly higher rate than other New York City residents.

6.      The NYPD's policy, practice and custom of Manufacturing Misdemeanors appears to be driven, at least in part, by the intense pressure placed on officers to generate more arrests, more summonses, and more stops.  Upon information and belief, officers who fail to achieve a specific amount of "activity" for each category of offense—felony, misdemeanor and violation—are penalized.  *See Floyd v. City of New York*, No. 08 Civ. 1034, -- F. Supp. 2d --, 2013 WL 4046209, at *33 (S.D.N.Y. Aug. 12, 2013) ("officers are routinely subjected to

significant pressure to increase their stop numbers, without corresponding pressure to ensure that stops are constitutionally justified").

7.      Plaintiffs, like countless other Blacks and Latinos throughout New York City, and particularly the Bronx, were falsely charged and prosecuted for a crime they did not commit and needlessly subjected to the harsh consequences of being charged with a misdemeanor crime based on the lies of the officers who charged them.  Plaintiffs are entitled to damages for Defendants' unconstitutional actions.

## PARTIES

8.      Plaintiffs are all citizens of the United States.  At all relevant times, they resided in Bronx, New York.

9.      Defendant City of New York ("City") is a municipal corporation organized and existing under the laws of the State of New York.  At all times relevant hereto, defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision and conduct of all NYPD personnel, including the defendants referenced herein.  In addition, at all relevant times, defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and the State of New York.

10.      At all relevant times, defendant Raymond W. Kelly was the Police Commissioner of the City of New York and, as such, made and enforced the policy of the NYPD, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

11.     Defendant Russell J. Green is the Commanding Officer of the NYPD's 43rd Precinct and, upon information and belief, was the Commanding Officer of the NYPD's 43rd Precinct at the time of the events alleged herein.  In his role as Commanding Officer, defendant Green made and enforced the policy of the 43rd Precinct, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

12.     Defendant John Hart is the Commanding Officer of the NYPD's 46th Precinct and, upon information and belief, was the Commanding Officer of the NYPD's 46th Precinct at the time of the events alleged herein.  In his role as Commanding Officer, defendant Hart made and enforced the policy of the 46th Precinct, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

13.     At all relevant times, defendant Marc Busell was the Commanding Officer of Police Service Area 7 and, as such, made and enforced the policy of Police Service Area 7, and acted in his capacity as agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

14.     At all times relevant hereto, Richard Roes # 1-10, acting in their capacity as agents, servants, and employees of defendant City, and within the scope of their employment as such, were training, supervisory and policy making personnel within the NYPD who implemented, enforced, perpetuated and/or allowed the policy of Manufacturing Misdemeanors. Plaintiffs are unable to determine the names of these supervisory defendants at this time and thus sue them under a fictitious designation.

15.     All NYPD supervisory defendants, including defendant Kelly, are referred to collectively herein as the "Supervisory Defendants."

16.     At all times relevant hereto, NYPD Officer Cintron, Shield # 17999, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

17.     At all times relevant hereto, NYPD Officer Edwin Jerez, Shield # 9352, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

18.     At all times relevant hereto, NYPD Officer Guagliardi was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

19.     At all times relevant hereto, NYPD Officer Malvi Moncion, Shield # 12778, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

20.     At all times relevant hereto, NYPD Sergeant Dania Castro, was a sergeant in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of her employment as such.

21.     At all times relevant hereto, NYPD Officer Kevin M. Martin, Shield # 24921, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

22.     At all times relevant hereto, NYPD Officer Primitivo Montanez, Tax # 939058, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

23.     At all times relevant hereto, NYPD Officer Andry Duarte, Shield # 7302, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

24.     At all times relevant hereto, NYPD Officer Brian J. Flynn, Shield # 2084, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

25.     At all times relevant hereto, NYPD Officer Steven Lancia, Shield # 8781, was a police officer in the NYPD, acting in the capacity of agent, servant and employee of defendant City, and within the scope of his employment as such.

26.     At all times relevant hereto, defendants John/Jane Does # 1-5, whose actual names Plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe" and "Jane Doe," were police officers in the NYPD, acting in the capacity of agents, servants and employees of defendant City, and within the scope of their employment as such.

27.     All NYPD officer defendants, excluding the Supervisory Defendants, are referred to collectively herein as the "Individual Defendants."

## JURISDICTION AND VENUE

28.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and state common law.

29.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a), and the doctrine of supplemental jurisdiction.

30.     The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

31.     Plaintiffs demand trial by jury in this action.

## FACTUAL BACKGROUND

*New York Law Regarding Marijuana Possession*

32.     In New York, a person who possesses less than twenty-five (25) grams of marijuana concealed on his person is guilty of violating § 221.05, a non-criminal violation that does not allow for jail time for non-repeat offenders.  The maximum allowable penalty for a first-time offender convicted of violating § 221.05 is a fine of up to $100.  Where an arrestee is charged with violating § 221.05, and no other offense is alleged, the arrestee must "promptly" be issued a DAT and released from custody.  *See* N.Y. Crim. Proc. Law § 150.75.  A DAT requires a person to appear in court at some later specified date; a person who receives one need not go through the full arrest process.

33.     Section 221.10 of the New York Penal Law, on the other hand, is a class B misdemeanor, which allows for sentences of up to three months in jail.  *See* N.Y. Penal Law § 70.15.  Unlike when an individual is only charged with a violation under § 221.05, an individual charged with a misdemeanor under § 221.10 may be held in police custody for arraignment before a judge.  *See* N.Y. Crim. Proc. Law § 140.20(2).

*Negative Consequences of Being Charged with a Misdemeanor Instead of Violation*

34.     The negative collateral consequences of being charged with a misdemeanor are profound.  An arrestee charged with a misdemeanor may be held in custody until he or she can be seen by a judge for arraignment.  This period of detention regularly lasts at least twenty-four (24) hours, and frequently extends even longer.  Plaintiffs Mr. Felix and Mr. Zapata, for example, were both detained for approximately forty (40) hours before arraignment.

35.     Pre-arraignment conditions are typically deplorable and over-crowded. The arrestees are usually forced to share a single toilet and to sleep sitting up.

36.     An arrestee charged with a misdemeanor is fingerprinted and photographed, and the arrestee's information is entered into the DCJS database.  These entries remain in the database regardless of whether the person is convicted of a crime.  Violation arrests, on the other hand, are not entered into the DCJS database.

37.     Being listed in the DCJS database can have a damaging impact on a person's life.  Public employers screen job applicants using the DCJS database when deciding whether to hire or retain an employee or grant an occupational license, and therefore a person who has been charged with a Manufactured Misdemeanor is subject to adverse employment and licensing decisions as a result of his unnecessary inclusion in the DCJS database.  After being charged with a Manufactured Misdemeanor and entered into the DCJS database, Mr. Fearon was temporarily suspended from his job with the New York City Board of Education.

38.     Moreover, upon information and belief, the Office of Court Administration sells its data to private background-check and credit-reporting agencies on which private employers rely when conducting background checks on job applicants.  Indeed, Mr. Felix and Mr. Zapata were afraid to look for work after their arrests because they feared their arrests would be revealed to potential employers.

39.     A person who is charged with a misdemeanor is also likely to have to appear in court more times than if he was charged with a violation.  New York's Criminal Procedure Law provides that a person charged with a misdemeanor must be tried within sixty days of the commencement of the criminal action, while a person charged with a violation must be tried within thirty days of the commencement of the criminal action.  N.Y. Crim. Proc. Law §

30.30(c), (d).  In practice, these statutory time limits are virtually never met.  For example, when Francisco Zapata's case was ultimately dismissed on August 8, 2012, the case had been pending for 520 days, but only thirty days had been counted against the statutory speedy trial clock.

40.     The additional thirty days of speedy trial time allocated to prosecutors when a misdemeanor, rather than a violation, is charged can alter the course of a case.  Plaintiffs had to wait an average of 129 days from arraignment until their first trial date.  During this period, no speedy trial time accrued.  Once cases were in a trial-ready posture, prosecutors were responsible for more than 80% of postponements on trial dates.  The average adjournment requested by prosecutors was six days; the average actual length of an adjournment, however, was fifty-six days.  This pattern is replicated in virtually all marijuana possession cases in the Bronx.  Thus, by artificially increasing the speedy trial time available to prosecutors by thirty days, the practice of Manufacturing Misdemeanors may extend the life of a case by five additional adjournments, or an average of 280 days.  Here, Abraham Collins' case was dismissed after 247 days; Danilo Melendez's case after 282 days; Maurosol Felix's after 295 days; Angel Sanchez's after 377 days; Francisco Zapata's after 520 days; and Anthony Fearon's after an astonishing 590 days.

***Inflated and Racially-Biased Marijuana Arrests in New York City***

41.     Arrests for possession of small amounts of marijuana have been one of the primary forces driving the explosion of misdemeanor arrests in New York City over the past decade.  Indeed, § 221.10 arrests accounted for 1 in 5 misdemeanor arrests and 1 in 7 of *all* arrests in New York City in 2011, and are reportedly the most common type of arrest made by the NYPD.  In 2011 alone, DCJS calculated that the NYPD charged 50,688 people with § 221.10, bringing the total number of arrests under the statute for the five-year period from 2007 through 2011 to 227,118.

42.     Black and Latino men in low-income neighborhoods have overwhelmingly borne the brunt of the NYPD's marijuana arrest practices.  Citywide, Blacks and Latinos accounted for 84.1% of all § 221.10 arrests in 2011.  The racial disparity in arrest rates is even more striking in the Bronx, where, in 2011, 94.6% of the 13,131 people arrested under § 221.10 were Black or Latino.  These disparities persist despite the findings of multiple studies showing that Whites use marijuana at higher rates than either Blacks or Latinos.

***Notice of the Unconstitutional Practice of Manufacturing Misdemeanors***

43.     The NYPD has long been aware of how pervasive the practice of Manufacturing Misdemeanors is amongst NYPD officers.  As far back as May 2007, a professor from Queens College testified publicly in front of two committees of the New York State Assembly regarding marijuana arrests in New York City.  *See* Testimony of Harry G. Levine at Hearings of New York State Assembly Committees on Codes and on Corrections, Albany, New York, May 31, 2007 *available at* http://www.drugpolicy.org/sites/default/files/nymmj_levinetest.pdf.  As part of his testimony, the professor explained that most people arrested for marijuana possession were not smoking in public, but rather were generally found with marijuana in their pocket.  The professor also highlighted the NYPD's practice of targeting communities of color for heightened enforcement of the marijuana laws.

44.     In April 2008, the New York Civil Liberties Union ("NYCLU") issued a report entitled "Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City 1997-2006."  The report included a section called "Dropsy Arrests: How Pot in a Pocket Becomes Marijuana 'Burning or Open to Public View,'" in which the authors chronicle how and

why NYPD officers Manufacture Misdemeanors, and the alarming frequency with which the practice is used.  For example, the authors note the following:

> "Approximately two-thirds to three-quarters of those arrested for marijuana possession were not smoking and most were not displaying the marijuana.  Most had marijuana in a pocket or otherwise well concealed in their clothing or possessions.  However, the officers who found the marijuana in a search said in their report, and when speaking to an Assistant District Attorney, that they observed the marijuana because it was 'open to public view.'"

45.     Upon information and belief, high-ranking NYPD officials reviewed the NYCLU's report.  On April 30, 2008, an NYPD spokesman issued a formal response to the NYCLU's report, but failed to specifically address the practice of Manufacturing Misdemeanors that the report detailed.  *See* "Flawed Study on Marijuana Arrests" *available at* http://www.nyc.gov/html/nypd/html/pr/flawed_report.shtml.

46.     The NYPD's response to the NYCLU report did, however, acknowledge a striking disparity between the number of persons charged with § 221.10 and the number of persons charged with § 221.05.  It noted that, from 1997-2006, there were approximately 350,000 people charged with a misdemeanor under § 221.10, while there were only approximately 8,770 people charged with a violation under § 221.05.  *Id.*  Thus, according to the NYPD's own numbers, during a ten year period, approximately 98 out of every 100 persons arrested for low-level marijuana possession were found to be in possession of marijuana that was "burning or open to public view."  It defies logic to presume that such an overwhelming majority of persons arrested for marijuana possession would have been found holding marijuana that was burning or in plain view.  The NYPD's own numbers suggest that officers have been Manufacturing Misdemeanors for years; yet the NYPD deliberately chose to ignore the obvious implication of its statistics and permitted its officers to continue violating the constitutional rights of New York City residents.

13

47.     The NYPD was also on notice of the prevalence of Manufactured Misdemeanors and of the racially-biased enforcement of the marijuana laws through numerous articles in newspapers, magazines, and online news sources that appeared prior to any of the Plaintiffs' arrests.[1]

48.     A series of investigative reports by WNYC reporter Ailsa Chang in 2011 identified numerous arrestees who, like Plaintiffs, had been charged with possessing marijuana in public view even though the marijuana had only come into public view as a result of a police request or an unlawful search.

49.     On September 19, 2011, defendant Kelly issued a department-wide order—"Operations Order #49"— acknowledging that "[q]uestions have been raised about the processing of certain marihuana arrests." The Operations Order specifically addressed the practice of Manufacturing Misdemeanors and instructed officers regarding the circumstances under which § 221.10 may be properly charged. Upon information and belief, defendant Kelly would not have issued such a department-wide order unless he and other high-ranking NYPD officials were aware of the frequency with which NYPD officers were Manufacturing Misdemeanors.

50.     In June 2012, the Legal Aid Society filed a complaint in the Supreme Court of the State of New York, New York County, seeking a declaratory judgment that

---

[1] *See, e.g.*, Christine Hauser, *A Little Stop-and-Frisk May Turn Up a Little Pot*, N.Y. Times, Apr. 29, 2008, *available at* http://cityroom.blogs.nytimes.com/2008/04/29/a-little-stop-and-frisk-may-turn-up-a-little-pot/#more-2698; Tony Newman, *Stop the War on Pot Smokers*, N.Y. Daily News, Aug. 25, 2009, *available at* http://www.nydailynews.com/opinion/stop-war-pot-smokers-article-1.399588; Gabriel Sayegh, *New York City's Massive Marijuana Arrests*, Huffington Post, Aug. 26, 2009, *available at* http://www.huffingtonpost.com/gabriel-sayegh/new-york-citys-massive-ma_b_269384.html; Marc Jacobson, *The Splitting Image of Pot*, New York Magazine, Sep. 21, 2009, *available at* http://nymag.com/news/features/58995/; Alice Speri, *2010 Marijuana Arrests Top 1978-96 Total*, N.Y. Times, Feb. 11, 2011, *available at* http://cityroom.blogs.nytimes.com/2011/02/11/marijuana-arrests-increase-in-new-york-city/.

Manufacturing Misdemeanors is unlawful and an injunction ordering the NYPD to cease the practice.

**The NYPD's Deliberate Indifference to Manufactured Misdemeanors**

51.    Despite being aware that NYPD officers were regularly Manufacturing Misdemeanors, the NYPD and the Supervisory Defendants officials deliberately chose to ignore the facially unconstitutional practice and failed to take sufficient steps to stop Manufactured Misdemeanors from continuing to occur.

52.    The NYPD and the Supervisory Defendants' awareness of the prevalence of Manufactured Misdemeanors made it obvious that increased supervision and better training were needed to curb the well-entrenched practice and to protect against constitutional violations. Yet the NYPD and the Supervisory Defendants did nothing to improve the supervision or training they provided to NYPD officers regarding marijuana arrests.  By failing to do so, the NYPD and the Supervisory Defendants displayed a deliberate indifference to constitutional violations that they knew were occurring.

53.    The Operations Order issued by defendant Kelly failed to stop the practice of Manufacturing Misdemeanors.  Upon information and belief, the Order was not accompanied by increased supervision of NYPD officers or improved training regarding New York's marijuana laws.  By permitting the issuance of an order without implementing any enforcement mechanism or any change in departmental supervision or training, the NYPD and the Supervisory Defendants was deliberately indifferent to the effectiveness of the Operations Order in actually curtailing Manufactured Misdemeanors.  In fact, the Operations Order proved ineffective at preventing the practice as plaintiff Maurosol Felix was charged with a Manufactured Misdemeanor just a couple of months after it was issued.

*NYPD Quotas: Encouraging Manufactured Misdemeanors*

54.     Through its quota system, the NYPD encourages and rewards officers for making arrests, making stops and issuing summonses.  Each officer's record is broken down into three categories—felony, misdemeanor, and violation.  Upon information and belief, officers are required to make a certain number of arrests in each category every month.

55.     The NYPD enforces its quota system by disciplining those officers who do not meet their quotas.  These consequences incentivize NYPD officers to do everything in their power to make their quotas.

56.     During recent hearings in *Floyd, et al. v. City of New York, et al.*, No. 08 Civ. 1034 (SAS)(HBP) (S.D.N.Y.), multiple NYPD officers testified that because of mandated quotas for arrests, summonses and stop-and-frisks, officers were compelled to make unnecessary stops and arrests.[2]  After hearing the testimony in that case, the court concluded that "[o]fficers may be subject to warnings and more severe adverse consequences if they fail to achieve what their superiors perceive as appropriate enforcement activity numbers."  *Floyd*, 2013 WL 4046209, at *33.

57.     As a result of this quota system, and the perverse incentives it imposes, some NYPD officers have developed a policy, practice and custom of lying on criminal complaints—including Plaintiffs'—so as to "justify" charging a misdemeanor rather than a violation.

58.     The NYPD, through the Supervisory Defendants, enforces its quota system and encourages officers to Manufacture Misdemeanors.

---

[2] *See* Marina Carver, *NYPD Officers Say They Had Stop-and-Frisk Quotas*, CNN, March 22, 2013, available at http://www.cnn.com/2013/03/22/justice/new-york-stop-and-frisk-trial.

## INDIVIDUAL PLAINTIFFS' FACTUAL ALLEGATIONS

*Maurosol Felix*

59.     Mr. Felix is a 42 year old Latino man who lives in the Bronx.

60.     Mr. Felix is a disabled man who suffers from a host of illnesses.

61.     In the past, Mr. Felix has used marijuana for medicinal purposes to treat his illnesses because it helps with his pain management and appetite.

62.     On March 16, 2012 at approximately 6:10 p.m., Mr. Felix exited the Tremont Ave. train station via the 179th Street exit with the intention of heading home.

63.     Upon exiting the train station, Mr. Felix walked into a convenience store directly in front of the train station exit.

64.     Mr. Felix purchased some food at the store and left to walk home.

65.     As Mr. Felix was walking down 179th Street from Grand Concourse and nearing the entrance to his building, a marked NYPD vehicle turned the corner from Creston Avenue onto 179th Street and approached him.

66.     Defendant Cintron, who was sitting in the driver's seat, motioned Mr. Felix over to the NYPD vehicle.

67.     Mr. Felix complied and approached the vehicle.

68.     Defendant Cintron asked Mr. Felix what was in his hand.

69.     Mr. Felix responded that he was holding food that he had just purchased at the store.

70.     Defendant Jerez then exited the NYPD vehicle from the passenger's side, came around the car, and approached Mr. Felix from behind.

71.     Mr. Felix asked, "What is this about?"  Both defendants Cintron and Jerez ignored Mr. Felix's question.

72.     Defendant Cintron then asked Mr. Felix where he lived.  Mr. Felix replied that he lived on the block and pointed to his building.

73.     Without provocation or justification, defendant Jerez used his body to forcefully and painfully pin Mr. Felix down on the NYPD vehicle.

74.     Defendant Cintron exited the vehicle and, without a warrant, without justification and without Mr. Felix's consent, began to search Mr. Felix's person.

75.     The violent manner in which Mr. Felix was pinned down caused him severe pain in his leg.

76.     Mr. Felix cried out that his leg was in pain, but his cries were ignored.

77.     During this warrantless, illegal, and unjustified search, defendant Cintron reached into the inside pocket of Mr. Felix's coat and recovered a small amount of marijuana.

78.     The marijuana recovered by defendant Cintron was inside Mr. Felix's pocket from the time he exited the subway until the time it was recovered by defendant Cintron. It was never in public view.

79.     During this illegal and unjustified search, defendants Cintron and Jerez confiscated Mr. Felix's keys, cell phone and Blackberry.

80.     Shortly thereafter, defendants Concepcion and Guagliardi arrived on the scene in a NYPD van.

81.     Mr. Felix was placed in the police van with defendants Concepcion and Guagliardi.

82.     Mr. Felix remained in the police van for an extended period of time as defendants Concepcion and Guagliardi went to arrest another individual.

83.     While Mr. Felix was in the police van, defendant Guagliardi turned to him and said, in sum and substance, "Don't take this personally.  I have a quota to make."

84.     Mr. Felix was eventually taken to the 46th precinct where he was held overnight.  He was then taken to Bronx Central Booking where he was again held overnight.

85.     While he was in custody, Mr. Felix was fingerprinted.

86.     Mr. Felix was wrongfully imprisoned by defendants for approximately two days.

87.     Mr. Felix was released on March 18, 2012.

88.     During his unlawful incarceration, Mr. Felix was not adequately fed and was not permitted to take his medication.

89.     After his release, Mr. Felix's confiscated property was never returned to him.

90.     Mr. Felix was charged with Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

91.     This charge was knowingly and intentionally false and malicious.

92.     Defendant Jerez swore to a false and fabricated account of the events surrounding plaintiff's arrest.  In his deposition in support of the complaint against Mr. Felix, defendant Jerez falsely stated, under penalty of perjury, that Mr. Felix "was observed in possession of a large ziplock bag of marijuana in his right hand in plain view."

93.     At no time during the events described above did the defendants have reasonable suspicion or probable cause to stop Mr. Felix or to search Mr. Felix.  At no time did Mr. Felix possess a large ziplock bag of marijuana in his right hand in plain view.

94.     Mr. Felix had to appear in court six times to defend the criminal charges against him.

95.     The criminal charges against Mr. Felix were dismissed in his favor on January 7, 2013.

96.     As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching, and maliciously prosecuting Mr. Felix, Mr. Felix suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation, and embarrassment.

97.     The arrest, detention and prosecution of Mr. Felix lacked probable cause, and were done maliciously, falsely, and in bad faith.  Defendants Cintron, Jerez, Concepcion and Guagliardi acted in wanton and reckless disregard for the rights of Mr. Felix.

98.     Mr. Felix has suffered substantial emotional harm as a result of his arrest. He was terrorized by the assault; he is fearful when he walks in the street; and he is still afraid of police officers.  He is even afraid to be on the street after dark for fear that he will be accosted again by the NYPD.

99.     Mr. Felix was out of work at the time he was arrested.  He had been looking for a job prior to his arrest.  After his arrest, he was forced to abandon his search, afraid that any job interview would end in disaster once a potential employer saw the arrest and pending criminal charge.

100.     Within ninety days after the criminal charges against him were dismissed in his favor, a written notice of claim, sworn by Mr. Felix, was served upon defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

101.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

102.     This action has been commenced within one year and ninety days after the criminal charges against Mr. Felix were dismissed in his favor.

*Danilo Melendez*

103.     Mr. Melendez works as a stocker at a Western Beef grocery store in the Bronx.  Though he has since been transferred to a new store, on July 14, 2011, Mr. Melendez worked at the Western Beef located at 301 Morris Avenue.

104.     Mr. Melendez was at work on July 14, 2011.

105.     During one of his regularly scheduled thirty-minute work breaks, Mr. Melendez went to a nearby deli to purchase a soda.

106.     As he was nearing the deli, a blue and white NYPD van pulled up in front of Mr. Melendez.  Defendants Moncion, Castro and Doe # 1 exited the vehicle.

107.     Defendants Moncion, Castro and Doe # 1, without a warrant and without cause, stopped Mr. Melendez as he was about to enter the deli.

108.     Defendant Moncion asked Mr. Melendez to produce identification.  Mr. Melendez complied.

109.     Defendant Moncion stated to Mr. Melendez, "Yo, you got anything on you?"

110.     Without waiting for a response, and without cause to do so, defendant Moncion began searching Mr. Melendez.

111.     During the course of this warrantless, unreasonable and unjustified search, defendant Moncion ordered Mr. Melendez to empty his pockets.

112.     Mr. Melendez complied with the request to empty his pockets, pulling out, among other things, a cigarette packet.

113.     Defendant Moncion opened the cigarette packet and recovered a small, half-smoked marijuana cigarette.

114.     Defendant Moncion roughly placed Mr. Melendez in handcuffs and shoved him into the blue and white NYPD van.

115.     Mr. Melendez was taken to Police Service Area 7, where he was detained for more than five hours, causing him to miss half a day at work.

116.     While he was in custody, Mr. Melendez was fingerprinted.

117.     When Mr. Melendez was brought inside the precinct, NYPD officers began cheering for defendant Moncion and congratulating him.

118.     In a deposition in support of the complaint against Mr. Melendez, defendant Moncion falsely stated, under penalty of perjury, that Mr. Melendez was observed "in possession of 1 marijuana cigarette in his left hand."

119.     Based on the supporting deposition of defendant Moncion, Mr. Melendez was arraigned on October 4, 2011 and charged with Unlawful Possession of Marijuana, a violation, pursuant to N.Y. Penal Law § 221.05.

120.    On November 1, 2011, a superseding criminal complaint was filed against Mr. Melendez, which added a charge of Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

121.    In support of this superseding complaint, defendant Moncion falsely stated, under penalty of perjury, that he observed Mr. Melendez "to have on his person, in his left hand, in public view, one (1) cigarette containing a dried-green leafy substance with a distinctive odor alleged to be marijuana."

122.    These charges were knowingly and intentionally false and malicious.

123.    Mr. Melendez appeared at court eight times in order to defend himself against these unjustified and unlawful charges.

124.    The criminal charges against Mr. Melendez were dismissed in his favor on July 12, 2012.

125.    As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching, and maliciously prosecuting Mr. Melendez, Mr. Melendez suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation, and embarrassment.

126.    The arrest, detention and prosecution of Mr. Melendez lacked probable cause, and were done maliciously, falsely, and in bad faith.  Defendants Moncion, Castro and Doe #1 acted in wanton and reckless disregard for the rights of Mr. Melendez.

127.    Since his arrest, Mr. Melendez continues to suffer extreme emotional distress.  Seeing police officers on the street makes him nervous, and he attempts to avoid making eye contact with officers whenever possible for fear that he will be subjected to another illegal stop or unlawful arrest.

128.     Mr. Melendez also suffered anxiety about retaining his job after being arrested for a misdemeanor offense and being forced to miss work on a number of occasions.

129.     Within ninety days after the criminal charges against him were dismissed in his favor, a written notice of claim, sworn by Mr. Melendez, was served upon defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

130.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

131.     This action has been commenced within one year and ninety days after the criminal charges against Mr. Melendez were dismissed in his favor.

### Francisco Zapata

132.     Mr. Zapata is a journalist and television reporter.  He has also been a lifeguard in New York City for approximately twenty years.

133.     On the night of March 5, 2011, Mr. Zapata was walking down Ford Street in the Bronx listening to his headphones.

134.     All of a sudden, without any warning or provocation, defendant Martin, a uniformed NYPD officer, ran up behind Mr. Zapata, violently grabbed Mr. Zapata and forcefully pushed him against a wall.

135.     Upon information and belief, there have been a substantial number of complaints filed with the NYPD's Civilian Complaint Review Board against defendant Martin. Defendant Martin has also been named as a defendant in at least three civil rights lawsuits, at least one of which alleged that he filed false charges relating to marijuana possession.  *See Nunez v. City of New York, et al.*, No. 12 Civ. 8066 (TPG) (S.D.N.Y.).

24

136.    Without seeking or receiving Mr. Zapata's consent, defendant Martin placed his hands on Mr. Zapata in a threatening manner, and asked Mr. Zapata, "Are you trying to tell people we are here?"

137.    Not knowing what defendant Martin was talking about or why he was being accosted, Mr. Zapata attempted to show his press identification card to defendant Martin.

138.    Defendant Martin, however, refused to look at Mr. Zapata's identification.

139.    Mr. Zapata was fearful for his safety and looked down to see defendant Martin's badge.

140.    Defendant Martin told Mr. Zapata not to look down, and brutally and unjustifiably struck Mr. Zapata's head three times with his elbow.

141.    Without seeking or receiving Mr. Zapata's consent, and without cause, defendant Martin aggressively pushed Mr. Zapata against the wall and began searching him.

142.    As he was searching Mr. Zapata, defendant Martin repeatedly threatened Mr. Zapata, stating, "If you keep moving, I'm going to smash your face into the wall."

143.    While defendant Martin was searching Mr. Zapata, he placed his hands down Mr. Zapata's pants and inside Mr. Zapata's underwear and touched Mr. Zapata's testicles.

144.    During this unwarranted and unjustified search to which Mr. Zapata did not consent, defendant Martin opened Mr. Zapata's jacket, and located a small amount of marijuana inside Mr. Zapata's shirt pocket.

145.    The marijuana defendant Martin recovered from Mr. Zapata's shirt pocket was not in public view.

146.    Defendant Martin forcefully placed Mr. Zapata in handcuffs and led him over to other NYPD officers.

147. Defendant Martin stated to the other NYPD officers: "We got our first idiot of the night."

148. Mr. Zapata was placed in the back of a NYPD vehicle, where he sat for an extended period of time.

149. Mr. Zapata was eventually taken to the 46th precinct where he was held overnight.

150. The next day, March 6, 2011, Mr. Zapata was transported to Bronx Central Booking.

151. While he was in custody, Mr. Zapata was fingerprinted.

152. After approximately two days in custody, Mr. Zapata was released from custody on March 7, 2011.

153. Defendant Montanez entered Mr. Zapata's arrest into the NYPD's database, charging Mr. Zapata with Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

154. In his deposition in support of the charges against Mr. Zapata, defendant Martin falsely stated, under penalty of perjury, that Mr. Zapata was holding marijuana in his right hand and in plain view at the time of his arrest.

155. These charges were knowingly and intentionally malicious and false.

156. Mr. Zapata had to appear in criminal court on eleven different days (including his arraignment) in order to defend himself against the criminal charges levied against him.

157. The criminal charges against Mr. Zapata were dismissed in his favor on August 8, 2012.

158.    As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching, and maliciously prosecuting Mr. Zapata, Mr. Zapata suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation, and embarrassment.

159.    The arrest, detention and prosecution of Mr. Zapata lacked probable cause, and were done maliciously, falsely, and in bad faith.  Defendants Martin and Montanez acted in wanton and reckless disregard for the rights of Mr. Zapata.

160.    Mr. Zapata has suffered substantial emotional harm as a result of his arrest.  He was terrorized by the assault, and feels as if he is forced to relive it every time he sees a police officer.  As a result, he will often go so far as to cross the street to avoid coming into contact with police officers.

161.    At the time of his arrest, Mr. Zapata was working as a freelance journalist. His work came primarily from making contacts with people in the industry and offering his services.  After he was arrested, Mr. Zapata stopped calling people in search of work for fear that his arrest would be uncovered and he would be blacklisted in the journalism community.

162.    Within ninety days after the criminal charges against him were dismissed in his favor, a written notice of claim, sworn by Mr. Zapata, was served upon defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

163.    At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

164.    This action has been commenced within one year and ninety days after the criminal charges against Mr. Zapata were dismissed in his favor.

27

*Abraham Collins*

165.    Mr. Collins is a 48 year old man who has spent the past 24 years working as a Direct Care Worker, teaching mentally handicapped people a variety of life skills.

166.    On the afternoon of July 28, 2011, Mr. Collins was walking to meet his work supervisor at the Forest Neighborhood House, which is located on the grounds of the Forest Houses complex.

167.    When he reached 166th Street, he saw defendants Duarte and Doe # 2 in an unmarked NYPD vehicle.

168.    Mr. Collins continued walking, but soon noticed that defendants Duarte and Doe # 2 were following him.  On 165th Street, defendants Duarte and Doe # 2 stopped, exited the vehicle, and approached Mr. Collins.

169.    Defendant Duarte asked Mr. Collins if he had any contraband on his person.

170.    Mr. Collins responded with honesty that he had a small amount of marijuana in his shorts pocket.

171.    The marijuana that was in Mr. Collins's shorts pocket was not in public view.

172.    Defendant Duarte reached into Mr. Collins's pocket and took the marijuana out.

173.    Defendant Duarte violently placed Mr. Collins in handcuffs.

174.    Mr. Collins was brought to Police Service Area 7, where he was strip-searched.

175.    While he was in custody, Mr. Collins was fingerprinted.

176.    Mr. Collins was charged with Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

177.    In his deposition in support of the charges against Mr. Collins, defendant Duarte falsely stated, under penalty of perjury, that Mr. Collins was holding marijuana in his left hand and in public view at the time of his arrest.

178.    These charges were knowingly and intentionally false and malicious.

179.    Mr. Collins appeared in court three times to defend the criminal charges against him, and was excused from appearing in court on a further two occasions when his criminal defense attorney appeared on his behalf.

180.    The criminal charges against Mr. Collins were dismissed in his favor on July 28, 2012.

181.    As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching, and maliciously prosecuting Mr. Collins, Mr. Collins suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation, and embarrassment.

182.    The arrest, detention and prosecution of Mr. Collins lacked probable cause, and were done maliciously, falsely, and in bad faith.  Defendants Duarte and Doe # 2 acted in wanton and reckless disregard for the rights of Mr. Collins.

183.    Mr. Collins has suffered substantial emotional harm as a result of his arrest.   Mr. Collins is frustrated and debilitated by the fact that he was targeted by the NYPD and subjected to an unjustified stop, illegal search, and unlawful arrest.

184.    Within ninety days after the criminal charges against him were dismissed in his favor, a written notice of claim, sworn by Mr. Collins, was served upon defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

185.    At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

186.    This action has been commenced within one year and ninety days after the criminal charges against Mr. Collins were dismissed in his favor.

***Angel Sanchez***

187.    Mr. Sanchez has worked for over one year as a driver for a drug and alcohol rehabilitation center in the Bronx.

188.    On March 7, 2011 at approximately 3:30 p.m., Mr. Sanchez was walking with a female friend down Benedict Avenue in the Bronx.

189.    All of a sudden, without warning and without provocation, an unmarked NYPD vehicle pulled up alongside Mr. Sanchez and his friend.

190.    Defendants Flynn, Doe # 3 and Doe # 4 jumped out of the vehicle and, without justification, stopped Mr. Sanchez and his friend.

191.    Defendants Flynn and Does # 3 and 4 detained Mr. Sanchez, but told Mr. Sanchez's friend to "keep walking."

192.    Without seeking or receiving Mr. Sanchez's consent, and without cause, defendant Flynn violently shoved Mr. Sanchez against a gate and began aggressively searching him.

193.    Throughout this illegal and unjustified search, defendant Flynn kept asking Mr. Sanchez, "Where is it?"

30

194.    Though defendants Flynn and Does # 3 and # 4 did not find any contraband on Mr. Sanchez, they nonetheless, illegally and without any cause, placed him in handcuffs and threw him into the back of their vehicle.

195.    With Mr. Sanchez in the vehicle, Doe # 3 drove a short distance down the road and stopped.

196.    Defendant Flynn then grabbed Mr. Sanchez and jerked him out of the car and back onto the street.

197.    Defendant Flynn kicked Mr. Sanchez's legs apart, opened Mr. Sanchez's pants, and pulled his underwear below his genitals.

198.    Passersby on the street were able to see Mr. Sanchez's genitals, causing him extreme embarrassment.

199.    While Mr. Sanchez was standing in the street with his genitals exposed, defendant Flynn touched Mr. Sanchez's testicles for an extended period of time.

200.    In the midst of defendant Flynn's invasive and illegal search, a bag containing a small amount of marijuana fell from the bottom of Mr. Sanchez's pants onto the street.

201.    Defendant Flynn violently shoved Mr. Sanchez back into the police vehicle, and Mr. Sanchez was driven to the 43rd Precinct.

202.    Mr. Sanchez was detained at the 43rd Precinct for an extended period of time.

203.    While he was in custody, Mr. Sanchez was fingerprinted.

204.    Mr. Sanchez was charged with Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

205.     In his deposition in support of the charges against Mr. Sanchez, defendant Flynn falsely stated, under penalty of perjury, that Mr. Sanchez was observed placing a ziplock bag containing marijuana "into his waistband with his left hand in public view."

206.     These charges were knowingly and intentionally false and malicious.

207.     Mr. Sanchez appeared in court six times to defend the criminal charges against him.

208.     The criminal charges against Mr. Sanchez were dismissed in his favor on June 4, 2012.

209.     As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching, and maliciously prosecuting Mr. Sanchez, Mr. Sanchez suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation, and embarrassment.

210.     The arrest, detention and prosecution of Mr. Sanchez lacked probable cause, and were done maliciously, falsely, and in bad faith.  Defendants Flynn, Doe # 3 and Doe # 4 acted in wanton and reckless disregard for the rights of Mr. Sanchez.

211.     Mr. Sanchez has suffered substantial emotional harm as a result of his arrest by defendants.   He was terrorized by the assault, and the manner in which he was grabbed by defendant Flynn.  He continues to think about it almost daily.

*Anthony Fearon*

212.     On July 6, 2011, Mr. Fearon was employed as a Program Aid in a summer school program.

213.     Mr. Fearon was at work on Wednesday, July 6, 2011.

214.    At approximately 6:45 pm on July 6, 2011, Mr. Fearon was walking home from work by himself on the sidewalk alongside Bruckner Boulevard in the Bronx.

215.    As Mr. Fearon was nearing the intersection of Bruckner Boulevard and Hayemeyer Avenue, he noticed two police officers in plain clothes sitting in an unmarked van at a stop sign.

216.    When Mr. Fearon reached the intersection, without a warrant and without cause, one of the police officers demanded that Mr. Fearon stop and speak with him.

217.    Mr. Fearon complied and approached the van.

218.    As Mr. Fearon approached the men, defendants Lancia and Doe # 5 exited the van.

219.    Defendant Doe # 5 began interrogating Mr. Fearon, asking him where he lived, where he was coming from, and a barrage of other questions.

220.    While defendant Doe # 5 questioned Mr. Fearon, the second officer, defendant Lancia, walked up to Mr. Fearon and, without any explanation, cause, or warning, began an invasive search of Mr. Fearon's clothing.  Mr. Fearon never consented to the search.

221.    During the course of this warrantless, unreasonable and unjustified search, defendant Lancia lifted Mr. Fearon's shirt, reached directly into Mr. Fearon's pockets, and recovered a small bag of marijuana – less than two grams – from the coin pocket of his pants.

222.    Mr. Fearon was handcuffed, and transported to the 43rd precinct.

223.    Mr. Fearon was detained at the precinct for more than seven hours, and was not released until approximately 2:00 a.m. on July 7, 2011.

224.    While he was in custody, Mr. Fearon was fingerprinted.

225.     On September 27, 2011, a criminal complaint was filed against Mr. Fearon, charging him with Unlawful Possession of Marijuana, a violation, pursuant to N.Y. Penal Law § 221.05, and with Criminal Possession of Marijuana, a misdemeanor, pursuant to N.Y. Penal Law § 221.10.

226.     In a deposition in support of the complaint against Mr. Fearon, defendant Lancia falsely stated, under penalty of perjury, that Mr. Fearon was observed with one zip-lock bag of marijuana in his "right hand in plain public view," which he then placed in "his right front jeans coin pocket."

227.     These charges were knowingly and intentionally false and malicious.

228.     Mr. Fearon appeared at court four times in order to defend himself against these unjustified and unlawful charges, and was excused from appearing in court on a further seven occasions when his criminal defense attorney appeared on his behalf.

229.     The criminal charges remained pending against Mr. Fearon for almost two years.

230.     The criminal charges against Mr. Fearon were dismissed in his favor on May 9, 2013.

231.     As a result of defendants' conduct described above, including restraining, falsely arresting, falsely imprisoning, illegally searching, and maliciously prosecuting Mr. Fearon, Mr. Fearon suffered serious emotional injury, pain and suffering, emotional distress, mental anguish, humiliation, and embarrassment.

232.     The arrest, detention and prosecution of Mr. Fearon lacked probable cause, and were done maliciously, falsely, and in bad faith.  Defendants Lancia and John Doe # 5 acted in wanton and reckless disregard for the rights of Mr. Fearon.

233.    Shortly after he was arrested, Mr. Fearon learned from his supervisor that, because he had been fingerprinted while in custody, his arrest had been to the school in which he worked.  As a result of his arrest, Mr. Fearon was temporarily suspended from work.

234.    During the 2011-2012 school year, Mr. Fearon was interviewed three times for a potential promotion to another teaching position.  At each interview, his July 6, 2011 arrest was discussed.  Mr. Fearon never received a promotion.

235.    In September 2012, approximately fourteen months after he was arrested, Mr. Fearon's employment was not extended for the upcoming school year and he was terminated.  Mr. Fearon had been employed since 2008.

236.    Within ninety days after the criminal charges against him were dismissed in his favor, a written notice of claim, sworn by Mr. Fearon, was served upon defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

237.    At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

238.    This action has been commenced within one year and ninety days after the criminal charges against Mr. Fearon were dismissed in his favor.

<u>**AS AND FOR A FIRST CLAIM FOR RELIEF**</u>
42 U.S.C. § 1983
(Against All Individual Defendants)

239.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

240.    By reason of the foregoing, by stopping Plaintiffs without cause, by unlawfully searching Plaintiffs, by confining Plaintiffs against their will, by using gratuitous, excessive, and unconscionable force against Plaintiffs, by imprisoning Plaintiffs, by falsifying an account surrounding the events upon which the criminal complaints against Plaintiffs were

35

based, by making false statements under oath in the criminal court proceedings against Plaintiffs, by maliciously prosecuting Plaintiffs, by failing to take steps to intercede and protect Plaintiffs from such treatment, by falsifying the criminal complaints against Plaintiffs for collateral purposes, including but not limited to satisfying the NYPD's quotas, and by intentionally discriminating against Plaintiffs by targeting communities of color for heightened enforcement of marijuana laws, the Individual Defendants deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.  The Individuals Defendants' conduct manifested deliberate indifference to Plaintiffs' constitutional rights.

241.    The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as NYPD officers.  Said acts by the Individual Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  The Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

242.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

## AS AND FOR A SECOND CLAIM FOR RELIEF
42 U.S.C. § 1983
(Against All Supervisory Defendants)

243.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

244.     The Supervisory Defendants were, at the relevant times, supervisory personnel within the NYPD, with oversight responsibility over the Individual Defendants.  They were responsible for the training, instruction, supervision and discipline of the Individual Defendants, who applied New York's marijuana laws in a race-based manner by intentionally targeting communities of color, who Manufactured Misdemeanors, and who unlawfully stopped, illegally searched, falsely arrested, and maliciously prosecuted Plaintiffs in violation of their constitutional rights.  The Supervisory Defendants were also responsible for instructing the Individual Defendants to intentionally discriminate against, and target, communities of color, because of race and/or national origin, in order to achieve the quotas mandated by the NYPD.

245.     Upon information and belief, the Supervisory Defendants were aware and well-informed of the Individual Defendants' unconstitutional conduct perpetrated against Plaintiffs.

246.     The Supervisory Defendants had actual or constructive knowledge that the Individual Defendants were engaging in conduct that posed a pervasive and unreasonable threat to the constitutional rights of Plaintiffs.

247.     The Supervisory Defendants failed to protect Plaintiffs despite their knowledge that the Individual Defendants violated their constitutional rights and posed a serious threat to the free exercise of their constitutionally protected rights.

248.     The response of the Supervisory Defendants to their knowledge of this threat was so inadequate as to show deliberate indifference or tacit approval of the conduct of the Individual Defendants.

249.     The failure of the Supervisory Defendants to supervise and discipline the Individual Defendants amounted to gross negligence, deliberate indifference, and/or intentional misconduct.

250.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

### AS AND FOR A THIRD CLAIM FOR RELIEF
42 U.S.C. § 1983
(Against Defendant City)

251.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

252.     Defendant City, through the NYPD, and acting under the pretense and color of law, was aware of the prevalence of Manufactured Misdemeanors in New York City. Nonetheless, defendant City permitted, tolerated and deliberately chose to ignore a pattern and practice of police officers charging individuals with violations of § 221.10 without probable cause to do so.  It was obvious, and defendant City knew, that increased supervision and training would curtail the practice of Manufactured Misdemeanors, yet defendant City failed to provide this necessary supervision and training.  This widespread practice of, and tolerance for, Manufactured Misdemeanors by the NYPD constituted a municipal policy, practice, or custom and led to Plaintiffs' malicious prosecutions.

253.     Defendant City, through the NYPD, and acting under the pretense and color of law, has implemented a policy, practice and/or custom whereby NYPD officers target communities of color for enforcement of New York's marijuana laws.  Defendant City has been aware of, and deliberately indifferent to, the policy, practice and/or custom whereby NYPD officers intentionally discriminate against, and target, people of color, such as Plaintiffs, by

38

Manufacturing Misdemeanors against them, in order to achieve collateral purposes, including but not limited to reaching quotas set by the NYPD.

254.   By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiffs were subjected to false arrest, Manufactured Misdemeanors and malicious prosecution, defendant City has deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, the right to be free from unlawful and unwarranted deprivations of liberty and the right to equal treatment under the law guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

255.   As a direct and proximate result of the policy, practice and custom detailed above, Plaintiffs sustained the damages hereinbefore alleged.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
Malicious Prosecution
(Against Individual Defendants and Defendant City)

256.   Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

257.   The Individual Defendants, without probable cause, initiated a prosecution against Plaintiffs by falsely charging them with violating § 221.10.  In so doing, the Individual Defendants acted with a knowing, willful, wanton, malicious, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiffs' rights, privileges, welfare and well-being, and are guilty of egregious and gross misconduct toward Plaintiffs.

258.    All criminal proceedings commenced against Plaintiffs were terminated in Plaintiffs' favor.

259.    Defendant City, as employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior*.[3]

260.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
Violation of N.Y. Crim. Proc. Law § 160.10
(Against Individual Defendants and Defendant City)

261.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

262.    Despite the fact that the Individual Defendants were able to ascertain each Plaintiff's identity at the time of arrest, the Individual Defendants took each Plaintiff's fingerprints in violation of N.Y. Crim. Proc. Law § 160.10.  In so doing, the Individual Defendants acted with a knowing, willful, wanton, malicious, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiffs' rights, privileges, welfare and well-being, and are guilty of egregious and gross misconduct toward Plaintiffs.

263.    Defendant City, as employer of the Individual Defendants, is responsible for the Individual Defendants' wrongdoing under the doctrine of *respondeat superior*.[4]

264.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
Negligent Hiring/Training/Discipline/Retention of Employment Services
(Against Defendant City)

265.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.[5]

---

[3] Mr. Sanchez does not bring a claim for malicious prosecution against the City under New York law at this time.
[4] Mr. Sanchez does not bring a claim for violation of N.Y. Crim. Proc. Law § 160.10 against the City at this time.

266.    Defendant City, through the NYPD, owed a duty of care to Plaintiffs to prevent the conduct alleged, because under the same or similar circumstances, a reasonable, prudent, and careful person should have anticipated that injury to Plaintiffs or to those in a like situation would probably result from the foregoing conduct.

267.    Upon information and belief, defendant City knew or should have known, through the exercise of reasonable diligence, that the Individual Defendants were likely to engage in the injurious unconstitutional conduct alleged above.

268.    Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these Individual Defendants proximately caused Plaintiffs' false arrests and malicious prosecutions.

269.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages hereinbefore alleged.

---

[5] Mr. Sanchez does not bring this claim at this time.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

(A)    an order awarding compensatory damages in an amount to be determined at trial;

(B)    an order awarding punitive damages against the Individual Defendants and Supervisory Defendants only in an amount to be determined at trial;

(C)    reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(D)    directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

Dated: September 6, 2013
        New York, New York

                              EMERY CELLI BRINCKERHOFF
                                & ABADY LLP

                              75 Rockefeller Plaza, 20th Floor
                              New York, N.Y. 10019
                              (212) 763-5000 (t)
                              (212) 763-5001 (f)

                              By: _____
                                    Samuel Shapiro
                                    Katherine Rosenfeld

                              THE BRONX DEFENDERS

                              Scott D. Levy
                              360 East 161st Street
                              Bronx, NY 10451
                              (718) 838-7878 (t)
                              (718) 508-3547 (f)

                              *Attorneys for Plaintiffs*